```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN MARIANA ISLANDS
```

| | |
|---|---|
| STEVEN BROWNSTEIN d/b/a STEVEN BROWNSTEIN ENTERTAINMENT,<br><br>Plaintiff,<br><br>v.<br><br>JASON H. ALDAN, FREDRICK HOLLOMAN, and DOES 1–10 INCLUSIVE,<br><br>Defendants. | Case No. 1:17-CV-00005<br><br>DECISION AND ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANT ALDAN'S COUNTERCLAIM |

## I. INTRODUCTION

In this action, Defendant Jason H. Aldan has counterclaimed for abuse of process. (Answer to Second Amended Complaint and Counterclaim, ECF No. 30.)[1] Before the Court is Plaintiff Steven Brownstein's Motion to Dismiss Defendant's Counterclaim (ECF No. 31), supported by a Memorandum of Points and Authorities ("Memo.," ECF No. 31-1). Defendant Aldan filed an Opposition (ECF No. 32), which was superseded by a First Amended Opposition (ECF No. 34),[2] and Brownstein filed a Reply (ECF No. 35). The motion came on for a hearing on July 19, 2018. Having carefully reviewed all the papers and considered the oral arguments of counsel, the Court GRANTS the motion and dismisses the counterclaim without prejudice, for the reasons stated herein.

## II. BACKGROUND

This case is about a deal gone bad to bring the reggae band UB40 to perform in Saipan.

---

[1] Although they are contained in one filing, the Answer to the First Amended Complaint ("Answer") and Verified Counterclaim Complaint ("Counterclaim") have separate paragraph numbering. Therefore, for clarity in citations, the Court will refer separately to the Answer and the Counterclaim.

[2] The First Amended Opposition merely corrected the erroneous case caption that appeared in the Opposition (ECF No. 32). References to "Opp." are to the First Amended Opposition.

1

Brownstein claims against Defendant Fredrick Holloman for breach of contract, and against both Holloman and Aldan for fraud and unjust enrichment.

a. *Second Amended Complaint*

Brownstein is a Saipan concert promoter. (Second Amended Complaint ("SAC"), ECF No. 28, ¶¶ 1, 12.) Aldan works for CNMI Medical Referral in Hawaii (Answer ¶ 8) but also has worked from time to time with Brownstein to bring entertainers to Saipan (SAC ¶ 12). According to Brownstein, Aldan offered to put a deal together to arrange for UB40 to come to Saipan. (*Id.*) Aldan introduced Brownstein to Fredrick Holloman, a California concert promoter based in San Diego. (*Id.* ¶ 13.) Brownstein and Holloman entered into a first contract on June 2, 2015, to bring UB40 to Saipan for performances in August. (*Id.* ¶ 14.) On June 5, Brownstein wired $78,000 to Holloman's bank account in San Diego, in reliance (according to Brownstein) on "express representations of Aldan and Holloman" to guarantee UB40's performances in Saipan and Guam. (*Id.* ¶ 16.) Holloman falsely represented to Brownstein that $65,000 from those funds would be used for the "sole purpose of Artist deposit." (*Id.* ¶ 17, quoting Holloman.) The artist deposit was never submitted to UB40's management. (*Id.* ¶ 19.)

On July 21, 2015, Aldan arranged a conference call about the project with Holloman, another Californian named Mark Lamica, and Brownstein. (*Id.* ¶ 18.) During the call, both Aldan and Holloman told Brownstein that a further $37,000 was needed to secure UB40's performances. (*Id.*) Three days later, Brownstein wired the funds to Aldan's bank account in Honolulu, and Aldan then wired them to Holloman in California. (*Id.* ¶ 21.) At the time of the call, Aldan and Holloman knew that the artist deposit had not been made, but they failed to disclose this material fact. (*Id.* ¶ 19.) Soon after the call, Holloman told Aldan that he was working on a backdoor deal to secure UB40's performances without the knowledge of the band's

management. (*Id.* ¶ 20.) Neither Holloman nor Aldan disclosed that fact to Brownstein. (*Id.*) Lamica told Brownstein that Aldan had taken a cut from the funds that were expressly allocated for the UB40 performance. (*Id.* ¶ 22.)

In phone calls and emails over the next few months with Holloman, Aldan, and Lamica, representations were made – it's not stated by whom – that the artist deposit had been made and UB40 would appear as scheduled. (*Id.* ¶ 23.) In reliance, Brownstein expended thousands of dollars on promoting the concert and selling tickets. (*Id.* ¶ 24.)

On February 21, 2016, UB40 announced on social media that the Saipan and Guam performances were canceled, and instructed fans to contact Brownstein for a refund. (*Id.* ¶ 25.)

On May 6, 2016, Brownstein sent a letter to Holloman demanding reimbursement of $115,000. (*Id.* ¶ 27.) Brownstein asked Aldan for an accounting of the wired funds, and Aldan refused. (*Id.* ¶ 28.)

b. *The Counterclaim*

Aldan counterclaims for abuse of process. He asserts that Brownstein is using this lawsuit to make Aldan "a scapegoat for the backlash, bad press, and embarrassment that Steven Brownstein Entertainment has encountered" when fans were stuck with purchased tickets to canceled concerts. (Counterclaim ¶ 85.) The real culprit is Holloman, but since Brownstein can't find Holloman, he "has placed the onus on Aldan to answer for Brownstein's and Holloman's failed efforts to provide entertainment to Saipan and Guam." (*Id.* ¶ 86.)

Back in May 2015, Aldan agreed to help Brownstein seek information on how to book UB40. (*Id.* ¶ 28.) Also that month, on May 22, Brownstein contacted Neil O'Brien Entertainment to inquire about booking UB40. (*Id.* ¶ 29.) Aldan, meanwhile, contacted Dale Dorsett of Dredcarpet Productions, who said he was a partner with Holloman. (*Id.* ¶ 30.) Aldan arranged a

3

conference call with Brownstein, Dorsett, and Holloman. (*Id.* ¶ 32.) After the call, on June 2, Holloman sent a proposed contract (the first contract) to Aldan, who emailed it to Brownstein. (*Id.* ¶ 33.) On June 4, Aldan emailed Holloman a video drop script for UB40. (*Id.* ¶ 37.)

On June 10, 2015, Aldan reached out to UB40's management because Brownstein had not seen any video drops or advertisement on UB40's website. (*Id.* ¶ 39.) David O'Brien, of Neil O'Brien Entertainment, responded that management was unaware of the Guam and Saipan UB40 shows. (*Id.* ¶ 40.) Paul Hunter, UB40's tour manager, also advised he had no such knowledge. (*Id.* ¶ 41.) The next day, June 11, Aldan told Hunter that Brownstein (the investor) had booked UB40 through Holloman and requested confirmation that the money wires had been received. (*Id.* ¶ 42.) Aldan then contacted Holloman, who told him the arrangement was supposed to be a "backdoor deal" negotiated directly with UB40, without management's knowledge. (*Id.* ¶¶ 43–45.) Aldan then called Brownstein and told him what Holloman had said; Aldan told Brownstein it sounded fishy. (*Id.* ¶ 46.)

A few days later, Holloman called Aldan and Brownstein and told them that their actions were in breach of the first contract. (*Id.* 47.) Brownstein then took Aldan off the UB40 project and said he would "handle it from here." (*Id.* ¶ 48, quoting Brownstein.) Other than forwarding the occasional message and the July 23 payment to Holloman, Aldan had no further involvement in the project. (*Id.*)

On June 29, Aldan forwarded to Brownstein an email that a Quincy K, who works with Mark Lamica, had sent to Holloman detailing deal interference and unauthorized artist contact by Holloman and associates. (*Id.* ¶¶ 52–53.)

In July 2015, Holloman, Lamica, and Aldan had a conference call about a different show that Aldan was promoting. (*Id.* ¶ 54.) During the call, the UB40 project came up and Lamica

presented a new deal to save the UB40 show. (*Id.* ¶ 55.)

On July 20, Brownstein and Holloman entered into a new, second contract that moved the UB40 performance dates to December 2015 and raised the compensation to $90,000 per performance. (*Id.* ¶¶ 56–57.) To cover the additional fees, Brownstein wired $37,000 from his bank account in Saipan to Aldan's bank account in Honolulu, and Aldan then wired the money to Holloman. (*Id.* ¶¶ 58–59.)

That summer, Brownstein and Aldan continued to work together on other projects, but when Aldan told Brownstein he was not interested in further collaboration, the relationship soured and Brownstein became resentful. (*Id.* ¶¶ 60–62.) They bumped into each other at the Honolulu airport in September 2015; Brownstein was with Lamica and introduced him to Aldan, but Lamica was nervous and wondered if he was being set up. (*Id.* ¶ 63.)

On January 26, 2016, David Shephard of Neil O'Brien Entertainment emailed Brownstein and Paramount Entertainment a cease-and-desist letter that they were in breach of the UB40 contract and demanding they end all activity involving UB40. (*Id.* ¶ 64.) In February, Aldan heard through friends that the UB40 concert had been canceled because Brownstein had failed to secure the necessary visas. (*Id.* ¶ 65.)

In February or early March 2016, Brownstein called Aldan to ask about the $37,000 he had sent Aldan. (*Id.* ¶ 66.) Aldan reminded Brownstein that he had directly transferred the funds to Holloman and therefore could not provide a further accounting. (*Id.*) Brownstein told Aldan that Holloman had disappeared. (*Id.* ¶ 67.) Aldan then unsuccessfully attempted to reach Holloman, and he told Brownstein so. (*Id.* ¶ 68.) Brownstein told Aldan that his attorney would be contacting him to get information so that Brownstein could sue Holloman, and subsequently Aldan spoke with Brownstein's attorney. (*Id.*)

On May 6, 2016, Brownstein's attorney sent a letter to Holloman threatening to sue him for breach of contract and fraud if the $115,000 was not returned. (*Id.* ¶ 69.) The letter didn't allege wrongdoing by Aldan. (*Id.* ¶ 70.)

### III. PROCEDURAL HISTORY

On April 12, 2017, Brownstein brought suit in this Court against Holloman and Aldan, alleging breach of contract by Holloman, and fraud and unjust enrichment by Holloman and Aldan. The Court issued summonses for both defendants, but only Aldan was served.

On July 14, 2017, Aldan filed a motion to dismiss the fraud and unjust enrichment claims against him for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On November 29, 2017, the Court granted that motion and dismissed the claims without prejudice, giving Brownstein leave to amend. (Decision and Order, ECF No. 13.)

On January 31, 2018, Brownstein filed a First Amended Complaint (ECF No. 17) naming only Aldan as a defendant and omitting the breach-of-contract claim against Holloman. In response, on February 28, Aldan filed a Motion to Require Joinder of a Necessary Party (ECF No. 21), namely Holloman. The matter was resolved when the parties stipulated that Brownstein would "file a Second Amended Complaint . . . naming Fredrick Holloman as a defendant in this civil proceeding." (Stipulation, Apr. 3, 2018, ECF No. 26; Order [granting stipulation], Apr. 4, 2018, ECF No. 27; Order [denying joinder motion as moot], Apr. 7, 2018, ECF No. 29.) On May 4, Brownstein filed a Second Amended Complaint (ECF No. 28) naming both Aldan and Holloman as defendants, and a new summons for Holloman issued.

In response, Aldan filed his Answer to the Second Amended Complaint and Counterclaim, alleging abuse of process by Brownstein. Brownstein now moves to dismiss the

counterclaim.

## IV. LEGAL STANDARD

On a Rule 12(b)(6) motion, all well-pleaded factual allegations are taken as true. *Hebbe v. Pliler,* 627 F.3d 338, 341–42 (9th Cir. 2010). Exhibits that the plaintiff has attached to the complaint may be considered without having to convert the motion to dismiss to a motion for summary judgment. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).

Although a complaint does not need "detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations and internal quotation marks omitted). Legal conclusions couched as factual allegations do not suffice. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The claim to relief must contain sufficient well-pleaded facts to be "plausible on its face." *Twombly*, 550 U.S. at 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The purpose of this standard is "to give fair notice and to enable the opposing party to defend itself effectively[,]" and to ensure "that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Bacca,* 652 F.3d 1202, 1216 (9th Cir. 2011).

## V. ARGUMENTS OF THE PARTIES

Brownstein argues that Aldan's failure to plead facts supporting the allegation that Brownstein maliciously resented Aldan, together with the narrow construction given the tort of abuse of process, mandates dismissal of the counterclaim. (Memo. 3–4.) He asserts that to prove

abuse of process, evidence must show that legal process was used to accomplish a purpose for which it was not designed. (*Id.* 7.) Citing the Restatement (Second) of Torts § 682 cmt. b, he notes that an incidental motive of spite or resentment is not enough to support a claim for abuse of process. (*Id.* 6–7.) He asserts that even if Brownstein had an ulterior motive of salvaging his reputation by throwing shade on Aldan, abuse of process does not arise merely from bad intentions. (*Id.* 8, citing Prosser on Torts § 121 at 847 (5th ed. 1984).) He contends that abuse of process requires an allegation that the defendant used legal process to coerce the plaintiff to do something he could not legally be compelled to do. (*Id.,* citing *Brault v. Smith,* 679 P.2d 236, 240 (Mont. 1984).)

Aldan responds that while the tort of abuse of process may be disfavored, it is recognized in the CNMI and, along with related actions for wrongful use of civil proceedings and malicious prosecution, it serves "as both a deterrent to overzealous litigators as well as a means of redress for a defendant who was wrongfully dragged through the judicial system." (Opp. 3, quoting *Waibel v. Farber,* 2006 MP 15 ¶ 24.) He asserts that the hardship for a Hawaii resident to defend a lawsuit in Saipan, the repeated amendments of the complaint in an attempt to plead sufficient facts against him, and the flimsily supported allegation that he should have known Holloman was defrauding Brownstein, somehow bolster the claim of abuse of process. (Opp. 4.) He asserts that documents attached to the Answer and Counterclaim undermine Brownstein's unfounded suspicion that Aldan was hiding material facts from him or colluding with Holloman. (*Id.*) He distinguishes the facts of this case from those in cases drawn from other jurisdictions that are cited in support of the motion by Brownstein. (*Id.* 6–8.) He surveys Commonwealth Superior Court decisions on motions to dismiss abuse-of-process claims and maintains that they show Aldan has pled sufficient facts to survive a Rule 12(b)(6) motion. (*Id.* 11–13.)

In reply, Brownstein points to this Court's decision on whether to dismiss an abuse-of-process claim in another diversity case, *Alvarez v. Seahorse, Inc.,* Case No. 16-cv-00014, 2017 WL 3973035 (D. N. Mar. I. Sept. 8, 2017). (Reply 2–3.) There the Court denied the motion to dismiss because Seahorse's allegations that Alvarez had lied under oath and was using the lawsuit to extort money from Seahorse adequately pleaded that Alvarez was using process for a purpose other than that for which it was designed, to compel Seahorse to take some other action outside the lawsuit. *Id.* at *9. Brownstein reiterates his position, set forth in the memorandum supporting the motion, that Aldan has not pleaded facts showing the use of process for a purpose not proper in the conduct of the proceeding. (Reply 4.)

## VI. DISCUSSION

The tort of abuse of process is not defined in CNMI statute, nor has the Commonwealth Supreme Court elaborated its elements. *See Alvarez,* 2017 WL 3973035, at *9. Elements are set forth in some Commonwealth Superior Court decisions, but they are not consistent from one case to the next and are not controlling. *See, e.g., Mafnas v. Laureta,* Civil Action No. 88-696, Order, 11 (Commw. Super. Ct. July 10, 1995) (citing California law, "A prima facie case for abuse of process requires proof of an intentional misuse of judicially issued legal process in an attempt to accomplish a result not intended by such process."); *Hiraga v. Sekisui House,* Civil Action No. 98-0100A, Decision and Order, 6 (Commw. Super. Ct. July 29, 1999) (citing New York law, "The three essential elements of abuse of power are: (1) regularly issued process compelling the performance or foreclosure of some prescribed act; (2) an intent to do harm without excuse or justification; and (3) the person using the process must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of process."). Therefore, the Court must look to the restatements of law as the rule of

decision. *Alvarez,* 2017 WL 3973035, at *9 (citing 7 CMC § 3401); *see also Quitugua v. Al-Alou,* No. 13-0229-CV, Order, 8 (Commw. Super. Ct. Apr. 4, 2014) (relying on Restatement (Second) of Torts for elements of abuse of process). One is liable for abuse of process when one "uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed," and thereby harms another. Restatement (Second) of Torts § 682 (1977). Commentary to the Restatement elaborates the requirements:

> Thus, "there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." [Restatement (Second) of Torts § 682] cmt. b. For an abuse of process claim to stand "there must be use of the process for an immediate purpose other than that for which it was designed and intended." *Id.* A typical case of abuse of process involves "one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." *Id.*

*Alvarez,* 2017 WL 3973035, at *9.

Other jurisdictions have focused on two essential elements of abuse of process: (1) an ulterior motive in using the process and (2) a willful act committed in a wrongful manner. *Coleman v. Gulf Ins. Grp.,* 41 Cal.3d 782, 796 (1986); *see LaMantia v. Redisi,* 38 P.3d 877, 879 (Nev. 2002) ("the elements of an abuse of process claim are: (1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding" (internal citation and quotation marks omitted)). An ulterior motive is use of process "to obtain a collateral advantage . . . not within the scope of the process," and a willful act is one "not proper in the regular conduct of the proceedings." *Schmit v. Klumpyan,* 663 N.W. 2d 331, 421–22 (Wisc. App. 2003). A party's intent is irrelevant if its "acts are procedurally and substantively proper under the circumstances." *Waterfield v. Waterfield,* 61 N.E. 314, 328 (Ind. App. 2016) (citations omitted).

Furthermore, in many jurisdictions, courts "have held that the abuse of process tort is

inapplicable to the improper *initiation* of a civil proceeding." *Barakat v. Delaware Cty. Memorial Hosp.,* No. CIV.A. 97–2012, 1997 WL 381607, *2 (E.D. Pa. July 2, 1997) (original emphasis; citing several Pennsylvania cases), *see also Stetter v. Blackpool,* No. CV–09–1071–PHX–DGC, 2010 WL 4117256 (D. Ariz. Oct. 19, 2010), at *1 ("Unlike the tort of malicious prosecution, which covers the initiation of civil proceedings with malice and without probable cause, abuse of process addresses misuse of process after proceedings have been initiated."); *Ging v. Showtime Entertainment, Inc.,* 570 F. Supp. 1080, 1083 (D. Nev. 1983) (holding that Nevada courts would follow Arizona courts in finding that initiation of lawsuit cannot be tortious act as element of abuse of process); *Laforge v. Richland Holdings, Inc.,* No. 2:17-cv-00782-APG-VCF, 2018 WL 525298, at *7 (D. Nev. Jan. 23, 2018) ("The mere filing of a complaint with malicious intent is insufficient to state an abuse of process claim. Rather there must also be some act after filing that abuses the process."); *Lehew v. Bd. of Comm'rs for Comanche Cnty. Okla.,* 2007 WL 9711067, at *4 n.2 (W.D. Okla. Jan. 11, 2007) (under Oklahoma law, distinguishing malicious prosecution from abuse of process in that "the former lies for malicious initiation of process and the latter for a perversion of the process after it is issued").

Aldan has failed to state a claim for abuse of process. The only act he alleges is the initiation of the lawsuit against Aldan. No subsequent act abused process. There was nothing improper in continuing to name Aldan as a defendant in the Second Amended Complaint. The parties' stipulation (ECF No. 26) and the Court's order (ECF No. 27) required joining Holloman, not dismissing Aldan. The only allegedly improper motive Aldan suggests is to placate Brownstein's customers who blamed Brownstein when the UB40 performances were canceled. This is clearly insufficient, even if true, because it does not involve coercing Aldan to do something he cannot legally be compelled to do.

Other factors that Aldan mentions are irrelevant. Diversity jurisdiction cases always are a hardship on defendants outside the jurisdiction. On Aldan perhaps less so than most: he has substantial ties to the Commonwealth, he works for a CNMI agency (Medical Referral), and he has a shorter plane trip from Hawaii to Saipan than most non-CNMI residents would have. There is nothing improper in naming a person as a defendant who, prior to the filing of the lawsuit, was trying to help the plaintiff find another tortfeasor. If the claim is insufficiently pleaded, Aldan may move to dismiss, as he has already done once. If he believes he has evidence that undisputedly shows the falsity of Brownstein's claims against him, he may move for early summary judgment. The litigation need not be protracted.

The cases cited by the parties in their briefs do not change the analysis or outcome. Aldan, in his opposition, reviews each of the cases Brownstein cited and endeavors to distinguish their facts from those in this action. However, Brownstein cited those cases only for propositions of law – the elements of the tort, the meaning of "willful act," etc. – not as similar cases on the facts. While Aldan accurately observes that the law of other jurisdictions is not binding in the CNMI, he fails to show that the Commonwealth Supreme Court would reach a different understanding of the elements of abuse of process.

The Court distinguishes each of the cases as follows:

Aldan points out that in *Pankratz v. Willis,* 744 P.2d 1182 (Ariz. App. 1987), the procedural posture of the case – a motion for judgment notwithstanding the verdict – is different from ours. No matter: Brownstein cites it only for the proposition that "incidental motives of spite and greed are not actionable." *Id.* at 1196. Aldan does not deny it.

In *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 102 F.3d 1524 (9th Cir. 1996), *reversed on other grounds by* 523 U.S. 26 (1998), a multidistrict litigation case, the Ninth

Circuit held that the district court had properly dismissed an abuse-of-process claim, even though Milberg Weiss had allegedly offered to withdraw an early attempt to add Lexecon as a defendant in exchange for allegedly false testimony against existing defendants, and used the MDL case to impeach Lexecon expert witnesses during cross-examination in separate litigation. *Id.* at 1539. The Ninth Circuit held that the addition of Lexecon as a defendant in the multidistrict litigation did not have as its primary purpose an objective for which that litigation was not intended. *Id.* It specifically found that "[t]he acts alleged by Lexecon did not have as their *primary purpose* to inflict harm on Lexecon[.]" *Id.* (original emphasis).

It's hard to see why Aldan spends half a page discussing *Lexecon.* The facts seem to help Brownstein, as one of willful acts of Brownstein is the filing of an amended complaint. Furthermore, Brownstein cites *Lexecon* only for the proposition that "[t]he gravamen of the tort is not 'the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish.'" *Id.* (quoting Restatement (Second) of Torts § 682 cmt. a). Aldan points out that the Ninth Circuit was applying Arizona law. But the same Restatement § 682 that is the rule of law in the CNMI is "accepted by the Arizona Courts." *Id.* at 1538–39.

In *Flores v. Emerich & Fike,* 416 F. Supp. 2d 885 (E.D. Cal. 2006), a court dismissed an abuse-of-process claim arising in acrimonious litigation. The facts are not similar to those surrounding the UB40 incident, and Brownstein never asserts that they are. He cites it only for the unremarkable proposition that "[t]he tort of abuse of process constitutes 'the use of legal process against another to accomplish a purpose for which it is not designed.'" *Id.* at 904. Aldan points out that the district court is applying California law but does not try to distinguish it from

13

CNMI law. Nor could he: the quoted proposition mirrors comment *b* to Restatement § 682.

Aldan also addressed three other cases, arising out of Washington, Montana, and Arizona: *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44,* 699 P.2d 217 (Wash. 1985); *Brault v. Smith,* 679 P.2d 236 (Mont. 1984); and *Fappani v. Bratton,* 407 P.3d 78 (Ariz. App. 2017). Similar to *Pankratz, Lexecon,* and *Flores,* this group of cases is cited by Brownstein not for their facts but only for nearly unassailable law of the tort of abuse of process. Aldan fails to attempt to show that the Commonwealth Supreme Court would follow a different rule from the one they espouse.

The case of *Laforge v. Richland Holdings, Inc.,* 2018 WL 525298 (D. Nev. 2018) was cited by Brownstein in passing for the proposition that "[t]he mere filing of a complaint with malicious intent is insufficient to state an abuse of process claim." *Id.* at *7. Aldan (Opp. 11) quotes a passage where the district court reviewed several cases in which Nevada courts sustained abuse-of-process claims. But he does not discuss any of those cases or try to show how Brownstein's alleged willing acts and improper purpose are like any of them. Indeed, he would not be able to do so. The defendants in those cases used legal process to coerce the plaintiff to do something: to coerce payment, *Nevada Credit Rating Bureau v. Williams,* 503 P.2d 9, 12–13 (Nev. 1972); to obtain a police officer's voluntary resignation, *Posadas v. City of Reno,* 851 P.2d 438, 445 (Nev. 1993); and to coerce a nuisance settlement, *Bull v. McCuskey,* 615 P.2d 957, 960 (Nev. 1980). Aldan does not allege that Brownstein filed suit to coerce him to do something or to refrain from doing something. The lawsuit is for Brownstein to recover his alleged monetary damages from the failed UB40 concert.

Aldan looks for support in four Commonwealth Superior Court cases, but to no avail. In *Pangelinan v. Pangelinan,* the court dismissed an abuse-of-process claim without prejudice on

the grounds that the claim was not ripe because the underlying litigation was still pending. Order, Case No. 17-0067-CV, 10 (Commw. Super. Ct. Apr. 5, 2018). Aldan asserts that *Pangelinan* was wrongly decided, in that it improperly adds an element of disposition of the lawsuit. (Opp. 12.) *Accord Quitigua v. Al-Alou,* Case No. 13-0229-CV, 8–9, Order (Commw. Super. Ct. Apr. 4, 2014) (rejecting the view that the pending case must be decided in plaintiff's favor before an action for abuse of process is ripe). The best view is that the rule set forth in *Pangelinan* is too broad. The cases cited in *Pangelinan* support a narrower holding that "the allegedly abusive process that forms the basis for an abuse of process claim must be completed before a litigant may bring an abuse of process claim[.]" *Giordano v. Claudio,* 714 F. Supp. 2d 508, 533 (E.D. Pa. 2010); *see Mafnas v. Laureta, op. cit.,* 11 ("an action for abuse of process does not have to await disposition of the underlying case"). Hence, "[b]y definition, a lawsuit in its entirety cannot constitute an abuse of process when it has not yet been concluded." *Id.* (quoting *Access Fin. Lending Corp. v. Keystone State Mortgage Corp.,* Civ. A. No. 96-191, 1996 WL 544425, *5 and n.3 (W.D. Pa. Sept. 4, 1996). Here, Aldan claims that the whole lawsuit against him constitutes the abuse of process.

In *Mafnas v. Laureta,* Mafnas brought a quiet-title action against former district judge Alfred Laureta and others. Defendants counterclaimed for abuse of process. They alleged that Mafnas had purchased the disputed property with the intention to bring the quiet-title action so as to discredit Judge Laureta and disqualify him from cases concerning Article XII of the CNMI Constitution. *Mafnas* at 2–3, 12. The trial court found that defendants had made out a prima facie case and denied a motion to dismiss. *Id.* at 12. The court engaged in hardly any analysis in concluding that defendants had pled sufficient facts to show improper motive, issuance of process, and damages. *Id.* One may observe, however, that the pleadings included an allegation

of coercion – to force Judge Laureta to recuse from Article XII cases. Therefore, it cannot be said that *Mafnas* stands for a broader definition of the tort of abuse of process in the CNMI than one finds in other jurisdictions.

In *Hiraga v. Sekisui House, op. cit.,* at 2, the alleged wrongful act was not the filing of the complaint but plaintiff's motion to seal it. The Superior Court found that this allegation was insufficient to state a claim, and dismissed with leave to amend. *Id.* at 6. Analysis is sparse, and the facts bear little relation to those of the instant case.

In *Quitugua v. Al-Alou, op. cit.,* 10, the Superior Court denied a motion to dismiss an abuse-of-process counterclaim in a medical-malpractice action. The court listed a "plethora of facts" that supplied "adequate reason to sustain this claim." *Id.* at 9. Those "facts" include allegations that Quitugua had been less than forthcoming with Dr. Al-Alou about his medical history, failed to show up for appointments and take tests that had been ordered for him or disclose the full range of his symptoms. *Id.* The court also noted a "history of dishonest behavior" on the part of Quitugua. *Id.* at 10. It appears that these allegations are the main reason the court denied the motion to dismiss. The court also noted that Dr. Al-Alou alleged the purpose of the lawsuit was to "intimidate him and PMC into giving Quitigua a quick settlement." *Id.* On the whole, these allegations seem inadequate to make out a prima facie case, and the court may have erred in denying the motion to dismiss. First, the plethora of facts found by the court may be grounds to defend against the medical-malpractice claim, but it does not make the filing of the suit improper. Second, a legitimate purpose of filing suit may be to force a settlement. Settlement of claims is one of the purposes for which litigation is designed; it is not a "purpose other than that which it was designed to accomplish." Restatement § 682 cmt. a; *accord In re Shih,* Adversary No. 4:11-AP-01470, 2012 WL 2254243, at *3 (Bankr. D. Ariz. June 15, 2012)

("undertaking litigation in order to compel a settlement is a legitimate purpose of process, not an improper one"). While by its outcome this is a good case for Aldan, its reasoning is not persuasive and the Court does not adopt it.

A finding that Aldan has not stated a claim for abuse of process is consistent with the Court's recent finding that the defendants in *Alvarez* had stated such a claim. There, plaintiff had brought claims under the Fair Labor Standards Act for unpaid wages. *Alvarez,* 2017 WL 3973035, at *1–2. Defendants denied the plaintiff was their employee and counterclaimed for abuse of process, in part on the ground that in personal bankruptcy filings plaintiff had sworn on penalty of perjury that he was self-employed. *Id.* at *8. The Court observed that lying on penalty of perjury is in itself a type of abuse of process. *Id.* at *9. Moreover, defendants alleged coercion: that plaintiff was "using this lawsuit to extort more money or to retaliate against them for failing to agree to his demands" for 50 percent of the shares in the company. *Id.* No allegations of perjury, extortion, or other coercion are present in Aldan's counterclaim.

## VII.  CONCLUSION

Because Aldan has not stated a claim for abuse of process, Brownstein's Motion to Dismiss Defendant Aldan's Counterclaim is GRANTED. The dismissal is without prejudice. Aldan has not previously amended his countercomplaint, and amendment is not demonstrably futile. Leave is given for Aldan to amend his countercomplaint **no later than August 6, 2018.**

IT IS SO ORDERED this 23rd day of July, 2018

/s/ Ramona V. Manglona
RAMONA V. MANGLONA
Chief Judge

17